Approved: _____
JENNIFER N. ONG/SHIVA LOGARAJAH
Assistant United States Attorneys

Before:   THE HONORABLE JUDITH C. McCARTHY
United States Magistrate Judge
Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAXIM MARCHENKO,<br><br>Defendant. | 23mj 6181<br><br>**SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 371, 554, 1343, 1349, and 1956<br><br>COUNTY OF OFFENSE: DUTCHESS |

SOUTHERN DISTRICT OF NEW YORK, ss.:

JASON WAKE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**
**(Conspiracy to Defraud the United States)**

1.     From at least in or about May 2022, up to and including in or about August 2023, in the Southern District of New York and elsewhere, MAXIM MARCHENKO, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to defraud the United States and agencies thereof, by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful functions of the U.S. Census Bureau, U.S. Department of Commerce, and U.S. Customs and Border Patrol, agencies of the United States, in the enforcement of export control laws.

2.     In furtherance of the conspiracy and to effect the illegal object thereof, MAXIM MARCHENKO, the defendant, and others known and unknown, committed the overt acts set forth in paragraphs 15 through 25 of this Complaint, among others.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Conspiracy to Commit Money Laundering)**

3.     From at least in or about May 2022, up to and including in or about August 2023, in the Southern District of New York and elsewhere, MAXIM MARCHENKO, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and

agreed together and with each other to commit money laundering in violation of Title 18, United States Code, Section 1956(a)(2)(A).

4.     It was part and an object of the conspiracy that MAXIM MARCHENKO, the defendant, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, (a) smuggling goods from the United States, in violation of Title 18, United States Code, Section 554, and (b) wire fraud, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1956(h).)

**COUNT THREE**
**(Conspiracy to Smuggle Goods from the United States)**

5.     From at least in or about May 2022, up to and including in or about August 2023, in the Southern District of New York and elsewhere, MAXIM MARCHENKO, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, smuggling goods from the United States, in violation of Title 18, United States Code, Section 554.

6.     It was a part and an object of the conspiracy that MAXIM MARCHENKO, the defendant, and others known and unknown, would and did fraudulently and knowingly export and send from the United States, attempt to export and send from the United States, and cause to be exported and sent from the United States, merchandise, articles, and objects, contrary to laws and regulations of the United States, to wit, MARCHENKO unlawfully caused and attempted to cause companies in the United States to export OLED micro-displays subject to the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774, from the United States to the Russian Federation ("Russia"), contrary to Title 50, United States Code, Section 4819(a)(2)(F).

7.     In furtherance of the conspiracy and to effect the illegal objects thereof, MAXIM MARCHENKO, the defendant, and others known and unknown, committed the overt acts set forth in paragraphs 15 through 25 of this Complaint, among others.

(Title 18, United States Code, Section 371.)

**COUNT FOUR**
**(Promotional Money Laundering)**

8.     From at least in or about May 2022, up to and including in or about August 2023, in the Southern District of New York and elsewhere, MAXIM MARCHENKO, the defendant, and others known and unknown, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, (a) smuggling goods from the United States, in violation of Title 18,

2

United States Code, Section 554, and (b) wire fraud, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1956(a)(2)(A) and 2.)

## COUNT FIVE
### (Smuggling Goods from the United States)

9.    From at least in or about May 2022, up to and including in or about August 2023, in the Southern District of New York and elsewhere, MAXIM MARCHENKO, the defendant, and others known and unknown, fraudulently and knowingly exported and sent from the United States, attempted to export and send from the United States, and caused to be exported and sent from the United States, merchandise, articles, and objects, contrary to  laws and regulations of the United States, to wit, MARCHENKO unlawfully caused companies in the United States to export OLED micro-displays subject to the EAR, Title 15, Code of Federal Regulations, Parts 730–744, from the United States to Russia, contrary to Title 50, United States Code, Section 4819(a)(2)(F).

(Title 18, United States Code, Sections 554(a) and 2.)

## COUNT SIX
### (Conspiracy to Commit Wire Fraud)

10.    From at least in or about May 2022, up to and including in or about November 2022, in the Southern District of New York and elsewhere, MAXIM MARCHENKO, the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343.

11.    It was part and an object of the conspiracy that MAXIM MARCHENKO, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, MARCHENKO and others known and unknown agreed to make and cause false statements to be made to a U.S. company in order to fraudulently obtain OLED micro-displays, and to send and receive, and to cause others to send and receive, emails and other electronic communications to and from the Southern District of New York and elsewhere in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

## COUNT SEVEN
### (Wire Fraud)

12.    From at least in or about May 2022, up to and including in or about November 2022, in the Southern District of New York and elsewhere, MAXIM MARCHENKO, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and

3

for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, MARCHENKO engaged in a scheme to make and cause false statements to be made to a U.S. company in order to fraudulently obtain OLED micro-displays, and sent and received, and caused others to send and receive, emails and other electronic communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

13.    I have been an FBI Special Agent since in or about August 2014. I am currently assigned to the Counterintelligence Division of the FBI's New York Field Office, which focuses on cases involving, among other things, sanctions evasion, export control violations, counter-proliferation, wire fraud, bank fraud, and money laundering. During my time as an FBI Special Agent, I have become familiar with some of the ways in which criminal actors avoid export controls, evade sanctions, and smuggle goods and technology from the United States, and I have participated in numerous investigations involving sanctions evasion, export control violations, and smuggling.

14.    This affidavit is based upon my participation in the investigation of this matter, including my conversations with law enforcement agents and other individuals, my review of law enforcement reports and records, and my review of business records, phone records, email communications, text messages, and draft summaries and translations of such documents, communications, and messages. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

**Overview**

15.    Based on my participation in this investigation, including my conversations with other law enforcement agents and other individuals, my review of law enforcement reports and records, and my review of business records, shipping records, email communications and messages obtained pursuant to judicially authorized search warrants, and draft summaries and translations of such documents and communications, I have learned the following, in substance and in part:

a.    As set forth in greater detail below, the FBI and the Bureau of Industry and Security ("BIS") of the U.S. Department of Commerce ("Department of Commerce") have been investigating an illicit procurement network responsible for smuggling sensitive U.S. technologies out of the United States to Russia (the "Procurement Network").

b.    MAXIM MARCHENKO, the defendant, and two co-conspirators ("CC-1" and "CC-2"), are Russian nationals who have held primary roles in operating the Procurement

4

Network. As set forth in greater detail below, one of the main goals of the Procurement Network is to fraudulently obtain large quantities of dual-use, military grade micro-electronics, specifically dual-use OLED micro-displays manufactured by a particular American company based in Dutchess County, New York ("Company-1," and the "Micro-Displays")[1], for shipment to Russia. The Micro-Displays that the Procurement Network have smuggled to Russia have civilian applications, such as medical and veterinary imaging, digital cameras, and video games, and military applications, such as rifle scopes, night-vision goggles, thermal optics, and other weapon systems.

      c.    As described in more detail below, MARCHENKO's primary role in the Procurement Network is and was to maintain front companies based in Hong Kong. The Procurement Network used MARCHENKO's front companies to send payments to U.S distributors, such as Company-1, in an effort to conceal the source of the funds (i.e., Russia). Additionally, the Procurement Network used MARCHENKO's front companies as transshipment points between the U.S. distributors, such as Company-1, and the end users in Russia. At times, MARCHENKO, acting on behalf of the Procurement Network, also communicated directly with U.S. distributors on behalf of his front companies.

      d.    Since Russia's invasion of Ukraine in February 2022, and the tightening of U.S. export controls, the Procurement Network has operated with a cover story to conceal the fact—from U.S. Government agencies and Company-1—that the Micro-Displays are and were going to Russia. As part of the cover story, members of the Procurement Network falsely stated to U.S. distributors, e.g., Company-1, that the Micro-Displays were not going to Russia, but instead going to the People's Republic of China and other countries for scientific research, knowing that U.S. distributors like Company-1 were required to provide end user information to government agencies, such as the U.S. Census Bureau ("Census Bureau"), Department of Commerce, and U.S. Customs and Border Patrol ("CBP").

      e.    To further bolster their cover story, members of the Procurement Network, including MARCHENKO, arranged for transshipment points to front companies outside of Russia. To arrange shipments to these various transshipment points, including in Hong Kong, the Procurement Network utilized the services of a Hong Kong-based freight forwarding company (the "Freight Forwarder"), which is known to provide freight forwarding services to Russia.

      f.    The Procurement Network has also used front companies in Hong Kong, operated principally by MARCHENKO, to conceal the fact that payment for the Micro-Displays comes from Russia. In total, between in or about May 2022 and in or about August 2023, MARCHENKO's front companies have funneled a total of more than $1.6 million to the United States in support of the Procurement Network's efforts to smuggle the Micro-Displays to Russia.

---

[1] These Micro-Displays are subject to the Export Administration Regulations ("EAR") and are classified as EAR99. The EAR regulate the export of "dual use" items — items that have both a commercial application and a military or strategic use — which could contribute to the military potential of other nations or be detrimental to United States foreign policy or national security. *See* 15 C.F.R. § 730.3.

g.     Finally, over the course of their operations, members of the Procurement Network sent messages amongst themselves about evading U.S. Government scrutiny, and the need to "support the legend [cover story] that . . . we know nothing about Russia."

### The Defendant, CC-1, CC-2, and Relevant Entities

16.     Based on my participation in this investigation, including my conversations with other law enforcement agents and other individuals; my review of open-source materials; my review of a November 2022 nonimmigration visa application submitted by MAXIM MARCHENKO (the "MARCHENKO Visa Application"), the defendant, to the United States Citizenship and Immigration Services; my review of business records, email communications and messages obtained pursuant to judicially authorized search warrants; and draft summaries and translations of such documents and communications, I have learned the following, in substance and in part:

a.     MARCHENKO is a Russian national who resides in Hong Kong. MARCHENKO operates Alice Components Co. Ltd. ("Alice Components"), a Hong Kong-based company, and is the business owner/director of Neway Technologies Limited ("Neway"). Neway is a Hong Kong-based company that is located at an address on Castle Peak Road in Hong Kong (the "Castle Peak Address"). MARCHENKO also operates RG Solutions Limited ("RG Solutions"), which is located at the Castle Peak Address.

b.     MARCHENKO listed a phone number ending in 1175 (the "1175 Number") and a particular email address ("Email Address-1") on the MARCHENKO Visa Application. MARCHENKO uses both the 1175 Number and Email Address-1 to communicate with CC-1.

c.     CC-1 is a Russian national who works for Infotechnika, a Russia-based electronics seller. Between at least in or about April 2019 and at least in or about January 2023, Infotechnika used the Freight Forwarder to ship goods to Russia. Infotechnika also shared the same physical address as NPO Electronic Systems, a Russian electronics reseller. In or about March 2022, following the Russian invasion of Ukraine, the BIS imposed further sanctions against Russia by the addition of entities to the Entity List, including NPO Electronic Systems, for having been involved in, contributed to, or otherwise supported the Russian security services, military and defense sectors, and military and/or defense research and development efforts.[2]  Additionally, Infotechnika shares an IP address and phone number with OOO NPTC Topaz, a/k/a "NPC Topaz," another Russia-based company.

d.     As part of the cover story engineered by the Procurement Network, CC-1 has masqueraded as an employee for SSP LTD, a Hong Kong-based company located at the Castle Peak Address where some of MARCHENKO's other front companies operate, as described above, and as "Amy Chan"—a purported purchase manager for Alice Components, another one of

---

[2] The Department of Commerce's Entity List identifies entities for which there is reasonable cause to believe the entities have been involved, are involved, or pose a significant risk of being or becoming involved in activities contrary to the national security or foreign policy interests of the United States. *See* 15 C.F.R. § 744 Supp. No. 4. A license is required to export any item regulated under the EAR to an entity on the Entity List. *See* 15 C.F.R. §§ 744.11, 744.16.

6

MARCHENKO's front companies. I believe that CC-1 and "Amy Chan" are one and the same for the reasons described *infra* in paragraph 22(c).

        e.     As part of the Procurement Network's efforts, CC-1 communicates with U.S. distributors, masquerades as "Amy Chan," and works with MARCHENKO and CC-2 to smuggle the Micro-Displays from the United States through Hong Kong to Russia. CC-1 uses a phone number ending in 7407 (the "7407 Number") to communicate with MARCHENKO at the 1175 Number. CC-1 also emails, using an Infotechnika email account, MARCHENKO at Email Address-1.

        f.     CC-2 is a Russian national who is a director at NPC Topaz and the supervisor of CC-1. Additionally, CC-2 is a 25% shareholder of NPC Granat, a Russian company in the electronics production industry. NPC Granat was placed on the Entity List by the Department of Commerce in or about September 2016 because NPC Granat was identified as operating in Russia's arms or related material sector. *See* Exec. Order 13661; 81 Fed. Reg. 61595. As part of the Procurement Network with MARCHENKO and CC-1, CC-2 arranges for payments from Russian companies to MARCHENKO's Hong Kong-based front companies. MARCHENKO then passes along those payments to companies in the United States for, among other things, the Micro-Displays.

### Background on Applicable Export Regulations and Laws

        17.     Based on my training and experience, review of open-source materials, and conversations with other law enforcement agents and individuals, I have learned the following:

        a.     An exporter generally must file an Electronic Export Information ("EEI") with the Census Bureau when the value of a commodity being exported classified under each individual Schedule-B[3] number is over $2,500 or if a validated export license is required to export the commodity (regardless of value). 15 C.F.R. § 758.1(b). An EEI "is a statement to the United States Government that the transaction occurred as described" and includes "basic information such as the names and addresses of the parties to a transaction." 15 C.F.R. § 758.1(a).

        b.     An EEI can be filed by the U.S. Principal Party in Interest ("USPPI") (*e.g.*, the exporter), an authorized agent of the USPPI (*e.g.*, a freight forwarder), or the Foreign Principal Party in Interest ("FPPI") (*e.g.*, the ultimate consignee).

        c.     Typically, the carrier also files the EEI with the CBP.

        d.     Among other things, the EEI lists the country of the intended destination for goods being shipped outside the United States, the ultimate consignee's name and address, the intermediate consignee's name and address, and a description of the commodities to be exported.

---

[3] Schedule-B is a U.S.-specific classification code for exporting goods from the United States. It is administered by the Census Bureau's Foreign Trade Division, which keeps records of exports by country as well as the quantity and value in U.S. dollars. The Schedule-B is built upon the first 6-digits of the international Harmonized System (HS) code, which is administered by the World Customs Organization, and an additional 4-digits for statistical analysis.

e.      The EEI is used by the Census Bureau to collect trade statistics and by the BIS of the Department of Commerce for export control purposes.

f.      As detailed below, the Procurement Network has ordered and caused shipments of Micro-Displays to be exported.  At all relevant times the shipments of Micro-Displays were classified under Schedule-B and valued at more than $2,500 and thus required an EEI for export.

g.      Section 4819(a)(1), Title 50, United States Code, provides, in relevant part, that it is "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of . . . any of the unlawful acts described in paragraph (2)."

h.      Section 4819(a)(2)(F), Title 50, United States Code, in turn, provides, in relevant part, that "[n]o person may make any false or misleading representation, statement, or certification, or falsify or conceal any material fact, either directly to the Department of Commerce, or an official of any other United States agency. . . or indirectly through any other person . . . in connection with the preparation, submission, issuance, use, or maintenance of any export control document or any report filed or required to be filed pursuant to the Export Administration Regulations . . . [or] for the purpose of or in connection with effecting any export, reexport, or in-country transfer of an item subject to the Export Administration Regulations."

## Background on the Flow of U.S.-Sourced Electronics to Russia

18.      Based on my training and experience, review of open-source materials, conversations with other law enforcement agents and individuals, and review of and email communications and messages obtained pursuant to judicially authorized search warrants, and draft translations and summaries of these communications and messages, I have learned the following

a.      Russia is highly dependent on Western-sourced micro-electronics for its military's hardware, including components manufactured or sold in the United States.  Russia relies on third-party transshipment hubs and clandestine procurement and payment networks, such as the Procurement Network, to secure access to such U.S.-sourced electronics.

b.      Russia's weapons systems and military platforms—including rocket systems, drones, ballistic missiles, tactical radios, and electronic warfare devices—contain a range of predominantly Western-sourced components and micro-electronics that are critical to their functions.

c.      On or about December 16, 2022, MAXIM MARCHENKO, the defendant, sent CC-2 the link to an article titled, "The supply chain that keeps tech flowing to Russia."[4] Based on my review of the article, I know that the article discusses how, despite U.S. export restrictions against Russia, especially recent restrictions on sensitive technology following Russia's invasion of Ukraine, the global supply chain continues to feed Russia with Western computer components and other electronics by shipping them through other locations like Hong Kong.  As described in

---

[4] https://www.reuters.com/investigates/special-report/ukraine-crisis-russia-tech-middlemen/.

more detail below, I have learned that MARCHENKO shared this article during the course of the Procurement Network's operations.

### The Procurement Network's Operations Prior to February 2022

19.     Based on my training, experience, conversations with other law enforcement agents and individuals, review of records and email communications maintained by Company-1, and review of open-source materials, I have learned the following, in substance and in part:

a.     In or about October 2014, Radiofid Systems ("Radiofid"), a Russia-based company, became a customer of Company-1, which is based in Dutchess County, New York. Prior to purchasing the Micro-Displays, Radiofid submitted a presale questionnaire to Company-1 stating that the Micro-Displays were to be used in rescue kits for Emercom Russia—a Russian state-owned civil defense organization. Radiofid also submitted an additional presale questionnaire in or about February 2016 and indicated that the Micro-Displays would be incorporated into the same end product for the same end use for the same end country—*i.e.*, Emercom in Russia. The email address listed on the questionnaire is the same email address as the one provided on a 2016 nonimmigrant visa application by a computer scientist at NPC Granat.

b.     Between in or about November 2017 and in or about June 2021, Radiofid ordered from Company-1 a total of approximately 868 Micro-Displays, identified with a specific Company-1 part number ("Part Number-1"). At least some of these orders Micro-Displays were shipped in multiple shipments to Radiofid to the attention of "Maxim" at the Castle Peak Address. The 1175 Number was listed as the phone number for "Maxim."

c.     Between in or about November 2017 and in or about July 2021, Radiofid ordered from Company-1 a total of approximately 4,350 Micro-Displays, identified with a specific Company-1 part number ("Part Number-2"). At least some of these orders Micro-Displays were shipped in multiple shipments to Radiofid to the attention of "Maxim" at the Castle Peak Address. The 1175 Number was listed as the phone number for "Maxim."

d.     In internal records, Company-1 categorized Radiofid's 2020 and 2021 orders of the Micro-Displays as "Military."

e.     In or about October 2021 and in or about December 2021, Neway—one of the Hong Kong-based front companies associated with MAXIM MARCHENKO, the defendant— wired a total of approximately $136,630 to Company-1 for some of Radiofid's prior orders.

f.     Because the items identified by Part Number-1 and Part Number-2 listed above were shipped to a "Maxim"—a reference to the defendant's first name—at an address and phone number associated with MARCHENKO, and because payment was remitted by MARCHENKO's front company, Neway, I believe that at least some of the Radiofid orders of Micro-Displays from Company-1 were shipped to and paid for by MARCHENKO on behalf of organizations and end users in Russia, *i.e.*, Radiofid and Emercom.

20.     Based on my review of draft translations of messages sent or received by MAXIM MARCHENKO, the defendant, I have learned that during the time period of the Radiofid orders MARCHENKO exchanged several messages with CC-1 and CC-2 that referenced Company-1,

Part Number-1, Part Number-2, payment to Company-1, and tracking information for packages shipped by Company-1 from Dutchess County, New York. For example:

        a.      In or about December 2018, MARCHENKO informed CC-2 that Company-1 had received the payment. A few weeks later, CC-2 sent MARCHENKO the following message: "[Part Number-2] 1100pcs." In or about November 2020, CC-2 sent MARCHENKO a message and referenced 65 Micro-Displays from Company-1.

        b.      On or about June 16, 2021, CC-1 sent MARCHENKO the following message: "Hi! [Company-1] has shipped us, I don't have any documents yet but I have a track - 1ZV671740455295558." Based on my training, experience, participation in this investigation, and the fact that the message references shipping and "track," I believe that the alphanumerical number provided is a tracking number for a Company-1 shipment.

        c.      On or about December 6, 2021, MARCHENKO sent the following message to CC-1, which appears to be a message that MARCHENKO received from the vice president of a foreign bank: "Dear Maxim, Since the word 'ELECTRONIC COMPONENTS' was an entity hit the sanctions, going forward please avoid using it.  You can use the short form 'Elect Comp' instead." Based on my training, experience, and participation in this investigation, I believe the bank employee is advising MARCHENKO how to avoid sanctions. Two days later, MARCHENKO told CC-1: "This is [Company-1]."

        d.      On or about December 24, 2021, CC-1 sent MARCHENKO an invoice from Company-1 to Radiofid for the purchase of 650 Micro-Displays with Part Number-1. Approximately one hour later, MARCHENKO sent CC-1 confirmation that Neway wire transferred approximately $122,955 to Company-1.

        e.      Based on the above messages between MARCHENKO, CC-1, and CC-2, including the references to Company-1, the inclusion of Company-1 invoices to Radiofid, and the inclusion of tracking information for a Company-1 shipment, I believe that the Procurement Network, specifically, MARCHENKO, CC-1, and CC-2, ordered Micro-Displays from Company-1 prior to in or about February 2022 on behalf of organizations and end users in Russia, *i.e.*, Radiofid and Emercom.

**<u>Company-1's February 2022 Decision to Cease Business with Russian Entities</u>**

        21.      Based on my review of Company-1's records and communications and my conversations with other law enforcement agents and individuals, I have learned, in substance and in part, the following:

        a.      In or about February 2022, an executive at Company-1 sent an internal email to other employees notifying them that Company-1 and its board had decided not to sell their products to Russian customers or to customers who ship their products to Russia. The executive explained:

> Probably more than obvious at this time, but the Company and Board have decided it is no longer right for us to sell or ship to Russian customers and risk that our displays will be used in devices

that could put US or NATO forces in harm's way, or support Russia's unlawful invasion of Ukraine and its human rights abuse.

      b.     In or about May 2022, a Company-1 employee responded to an email from a Radiofid representative. In substance and in part, the Company-1 employee explained that business between the United States and Russia was on hold and, Company-1 needed to wait for the situation to resolve before it shipped their micro-displays again to Russia.

### The Procurement Network Employs a Cover Story to Illicitly Gain Access to the Micro-Displays

      22.     Based on my training, experience, conversations with other law enforcement agents and individuals, review of records and email communications maintained by Company-1, review of open-source materials, bank records, and email communications and messages obtained pursuant to judicially authorized search warrants, and draft summaries and translations of such documents and communications, I have learned the following, in substance and in part:

      a.     Alice Components became a new customer of Company-1 shortly after Company-1 decided it would no longer fulfill orders to Russian customers or customers who shipped their goods to Russia. As described further below, members of the Procurement Network—specifically, MAXIM MARCHENKO, the defendant, CC-1, and CC-2—were involved with Alice Components orders, just as they were with Radiofid. Thus, I believe the Procurement Network shifted to using Alice Components in an attempt to obtain the Micro-Displays because Company-1 would no longer do business with Radiofid—a Russian entity.

      b.     On or about March 24, 2022, "Amy" from Alice Components submitted a pre-sale questionnaire to Company-1 prior to purchasing the Micro-Displays. In the questionnaire, "Amy" stated that Alice Components was a wholesale distributor of electronic components and a contract manufacturer. Additionally, "Amy" stated that the Micro-Displays would be incorporated into "electron microscopes" for "medical research" and the end-user countries were listed as "China, Hong Kong, Malaysia, [and] Europe." Alice Components expected to purchase 3,000 to 5,000 Micro-Displays annually. "Amy Chan" signed the questionnaire as the purchase manager of Alice Components and certified that all of the facts in the questionnaire were true and that the Micro-Displays would not be used "for any purpose or [sent] to any end user contrary to the representations made."

      c.     Based on my review of subpoena returns and pen register information from an Internet Service Provider, I have learned that "Amy Chan" (who sometimes goes by "Amy") from Alice Components uses an email address with the same IP address as the phone using the 7407 Number, which is associated with CC-1. Additionally, based on my review of contact information contained in a cloud-based account belonging to MARCHENKO, I have learned that he saved the 7407 Number in the name of CC-1 at Infotechnika. Finally, after "Amy Chan" began interacting with an undercover FBI agent, I know that the 7407 Number—used by CC-1—was often times almost immediately in touch with MARCHENKO. For these reasons, I believe that "Amy Chan" is a fictious online persona that CC-1 used to help illicitly procure the Micro-Displays.

***June 2022: Alice Components Orders 500 Micro-Displays from Company-1***

d.      In or about June 2022, Alice Components ordered 500 Micro-Displays with Part Number-2 from Company-1 for approximately $292,050 (the "June Order"). The invoice listed Alice Components as the entity to be billed and the Freight Forwarder as the entity that the displays should be shipped to. Company-1 shipped the June Order from Dutchess County, New York to the Freight Forwarder in two shipments on or about June 30, 2022, and on or about August 4, 2022. As described further below, MARCHENKO used one of his Hong Kong front companies (RG Solutions) to mask the fact that payment for the June Order originated in Russia.

e.      As set forth above, *see supra* ¶ 17(a), an EEI is a mandatory declaration filed with the Census Bureau, CBP, and Department of Commerce, among other agencies, for all shipments outside of the United States valued over $2,500. Among other things, the EEI lists the country of the intended destination for goods being shipped outside the United States. Based on the information provided to Company-1, *see supra* ¶ 22(d), both EEIs for the June Order (one for the June 30, 2022 shipment and the other for the August 4, 2022 shipment) listed the destination for the shipment as Hong Kong and the ultimate consignee as the Freight Forwarder, also in Hong Kong.

f.      As set forth in more detail, *see infra* ¶¶ 22(g) – (J), in or about June 2022 (*i.e.*, when the June Order was placed), MARCHENKO received a contract for RG Solutions to sell electronic components to MEC LLC (a Russian company); RG Solutions then received a total of approximately $292,000 (*i.e.*, the cost of the June Order) from NPC Topaz and that wire transfer referenced the contract between RG Solutions and MEC LLC; and RG Solutions then wired approximately $183,000 to Company-1. In addition, MARCHENKO sent multiple invoices to CC-1 (at Infotechnika) from both RG Solutions and SSP LTD that billed either NPC Topaz or MEC LLC for Micro-Displays. Based on this sequence of events, I believe that the Procurement Network placed the June Order on behalf of a Russian end user.

g.      Around the time that Alice Components placed the June Order, MARCHENKO received a contract from a Russian company for the sale of electronic components. Specifically, on or about June 15, 2022, CC-1 emailed a contract (in Russian and English) to MARCHENKO. The contract was for RG Solutions, represented by MARCHENKO, to sell "electronic components" to MEC LLC, a Russia-based company. The contract was to be paid out in U.S. dollars and was to be effective until December 29, 2025. The contract contained the following reference number: "№ RU/30580500/00055."

h.      MARCHENKO continued to send invoices to CC-1 for the Micro-Displays. Based on my training, experience, and involvement in this investigation, I have learned that banks often require customers to provide additional documentation to explain large transfers of money into or out of an account. Accordingly, I believe these invoices were designed to provide assurance to inquiring banks for the large money transfers between MARCHENKO's Hong Kong front companies and the Russian end users for the products. As an example, on or about June 20, 2022, MARCHENKO sent CC-1 at Infotechnika an invoice from RG Solutions. The invoice billed NPC Topaz for 150 pieces of Part Number-2—a version of the Micro-Displays—which was to be shipped to NPC Topaz at an address located in Russia. As another example, between in or about June 2022 and in or about November 2022, MARCHENKO sent CC-1 at Infotechnika five invoices from SSP LTD (one of MARCHENKO's Hong Kong-based front companies) or RG

Solutions to MEC LLC for a total of approximately 959 Micro-Displays, identified with Part Number-2, for approximately $1.9 million.

           i.        Following the June Order, MARCHENKO received several messages from CC-1 and CC-2 that referenced the June Order. For example, on or about June 20, 2022, CC-2 messaged MARCHENKO: "Hi. Today I sent you 58 ( your [sic] orders) and 292 ( to [sic] pay for displays with RG), I think the bank will pay for the week." Based on my training, experience, and participation in this investigation, I believe "292" is a reference to the approximately $292,050 that Alice Components owed Company-1 for the June Order. As another example, a few days later, CC-1 emailed MARCHENKO an invoice from Company-1 to Alice Components for the June Order and asked that MARCHENKO pay the invoice. CC-1 also told MARCHENKO: "Be sure to pay from RG Solutions Limited."

           j.        Shortly thereafter, on or about June 23 and 27, 2022, RG Solutions received two wire transfers totaling $292,000 (each wire was for $146,000) from OOO NPTC TOPAZ, where CC-2 is a director. The wire transfers listed a Russian address for OOO NPTC TOPAZ. The wire transfers both contained the following text: "PAYMENT UNDER THE CONTRACT RU/30580500/00045 OF 20.05.2022,PROFORMA INVOICE RG 201706128 OF 20.06.2022 CONSUMER GOODS." Based on my participation in this investigation, I know that the contract reference number in this wire transfer information is nearly identical (but for one digit) to the reference number for the contract between RG Solutions and MEC LLC described in paragraph 22(g) above. On or about June 28, 2022, CC-1 messaged MARCHENKO to confirm that funds had been sent to him to pay Company-1: "The money to pay for [Company-1] has gone from us."

           k.        On or about June 29 and 30, 2022, Company-1 received two wire transfers to its U.S. bank account from RG Solutions, located in Hong Kong, for a total of approximately $183,000. On those days, MARCHENKO sent CC-1 wire transfer confirmations of payments from RG Solutions to Company-1. Based on this sequence of events, and my involvement in this investigation, I believe the money to pay for the Micro-Displays, which were falsely represented as not going to Russia, were paid for by CC-1 and CC-2 from Russia.

### August 2022: Alice Components Attempts to Order 2,000 More Micro-Displays from Company-1

           l.        On or about July 1, 2022, CC-1 (posing as Amy) requested on behalf of Alice Components that an account manager at Company-1 (the "Account Manager") provide a quote for 2,000 Micro-Displays. The Account Manager asked CC-1: "Please confirm this does not include Russia or Ukraine for end country." CC-1 replied: "I confirm that this does not include Russia or Ukraine for end country."

           m.        On or about August 26, 2022, Company-1 issued an invoice to Alice Components for an order of 2,000 Micro-Displays with Part Number-2 for a total of $1,038,400 (the "August Order"). The August Order was to be shipped to the Freight Forwarder. CC-1 later forwarded this invoice to MARCHENKO and, in substance and in part, asked that he pay the invoice from RG Solutions.

n.      In or about September 2022, CC-1 sent MARCHENKO the following messages about the August Order:

CC-1:      Can you pay us [Company-1] with RG solution ? [sic]

CC-1:      Hi! On [Company-1] how to start paying - very waiting for payment . It is obligatory from rg solution to send them . [sic]

o.      Alice Components and CC-1 continued to falsely represent to Company-1 that the end users of the Micro-Displays were not in Russia. For example, on or about September 12, 2022, CC-1 re-submitted a presales questionnaire for Alice Components to Company-1 to provide information regarding the ultimate consignee, which was listed as the National Health Commission of the People's Republic of China. The questionnaire provided the same ultimate production application information as the March 2022 questionnaire—*i.e.*, that the Micro-Displays were to be incorporated into electron microscopes for medical research and the end-user countries were China, Hong Kong, Malaysia, and Europe. As another example, in or about September 2022, CC-1 and the Account Manager exchanged emails regarding how Alice Components planned to use the Micro-Displays. In substance and in part, CC-1 explained how the micro-displays would be used in the microscope and confirmed that Alice Components would be performing the assembly of the eyepiece board that contained the micro-displays.

p.      On or about September 27 and 28, 2022, RG Solutions, located in Hong Kong, wired a total of approximately $180,000 to Company-1's bank account in the United States as a deposit for the August Order.

q.      On or about November 2, 2022, a Company-1 executive, at the direction of law enforcement, informed CC-1 that Company-1 would not be able to fulfill Alice Components's order for 2,000 Micro-Displays for compliance-related reasons. The executive stated that Company-1 would return the advance payment it had received and then referred Alice Components to an undercover company (the "UC Company")[5], which it described as a distributor of Company-1's Micro-Displays. In response, CC-1 asked Company-1 to return the prior payment to an account in the name of RG Solutions.

## The Procurement Network Continues Its Efforts to Obtain the Micro-Displays Using Misrepresentations

23.      Based on my training, experience, and conversations with other law enforcement agents and individuals, review of records and email communications maintained by Company-1, review of open-source materials, bank records, and email communications and messages obtained pursuant to judicially authorized search warrants, and draft summaries and translations of such documents and communications, I have learned the following, in substance and in part:

---

[5] An undercover company is a business or company that an undercover agent purports to exist and operate when in fact that business does not actually exist and is part of a law enforcement operation.

14

a.     On or about November 2, 2022, CC-1 (posing as "Amy Chan") emailed an undercover FBI agent (the "UC"), who was posing as an employee of the UC Company. In the email, CC-1 expressed an interest in purchasing 2,500 pieces of Part Number-2 (a version of the Micro-Displays), noting that Alice Components previously purchased the parts directly from Company-1. Approximately one week later, CC-1 emailed the UC and stated that the Micro-Displays would be used in electron microscopes for medical research. Additionally, CC-1 stated that the end user would be the National Health Commission of the People's Republic of China.

### Alice Components Purchases 50 Micro-Displays from the UC Company

b.     On or about November 15, 2022, CC-1 emailed a purchase order form to the UC for 50 Micro-Displays, with Part Number-2 for $32,500. CC-1 agreed that Alice Components would purchase 2,450 Micro-Displays in the future. A few days later, CC-1 emailed MAXIM MARCHENKO, the defendant, and attached an invoice from the UC Company to Alice Components for 50 Micro-Displays from Company-1 with Part Number-2. The invoice was for approximately $33,600. CC-1 advised that "it's better to pay from RG Solution (you definitely can't from Neway)." CC-1 also attached the bank account information for the UC Company. Based on my training, experience, and involvement in this investigation, I believe CC-1 was telling MARCHENKO not to use "Neway" because Neway was the entity MARCHENKO used to pay for Russia-based Radiofid purchases from Company-1. In other words, CC-1 was warning MARCHENKO not to use "Neway" to maintain the cover that the Micro-Displays would not be going to Russia.

c.     On or about November 23, 2022, the UC Company received a wire transfer to its U.S. bank account for approximately $33,600 from Namfleg Limited ("Namfleg"), a Hong Kong jewelry retailer at the Castle Peak Address. The Namfleg website lists Neway—with the Castle Peak Address, which is shared by many of MARCHENKO's other front companies—as a point of contact. Thus, because Neway is listed as a point of contact and because MARCHENKO remitted payment from Namfleg after being requested to by CC-1, I believe Namfleg is another of MARCHENKO's Hong Kong front companies.

d.     On or about November 28, 2022, CC-1 (posing as "Amy Chan") emailed the UC that the 50 Micro-Displays could be sent to the Freight Forwarder if the UC Company had trouble shipping to the originally provided address.

e.     On or about November 30, 2022, the UC Company shipped the 50 Micro-Displays to the Freight Forwarder ("Shipment-1"). The UC then emailed the tracking number to CC-1 for Shipment-1. Shortly thereafter, an IP address connected to NPC Granat—the Russia-based electronics company associated with CC-2, see supra ¶ 16(f)—checked the tracking information for Shipment-1. Over the next approximately three days, multiple IP address connected to NPC Granat checked the tracking information for Shipment-1. I believe this indicates that Alice Components was purchasing Micro-Displays, and MARCHENKO was paying for such Micro-Displays, for provision to a company in Russia, and not the National Health Commission of the People's Republic of China.

*Alice Components Orders 2,450 More Micro-Displays from the UC Company*

f.       On or about December 1, 2022, the UC sent CC-1 an invoice from the UC Company for 2,450 of Company-1's Micro-Displays, referencing Part Number-2. The displays were to be shipped to the Freight Forwarder for a total of approximately $1,594,000. CC-1 later forwarded this invoice to MARCHENKO. That same day, CC-2 sent the following message to MARCHENKO: "And on Monday, I'll start sending $1.6 million to pay [Company-1]." MARCHENKO and CC-2 then began discussing specifically how CC-2 would pay MARCHENKO, with CC-2 asking "[h]ow much can I pay per SSP"—a reference to SSP LTD, one of MARCHENKO's Hong Kong front companies.  MARCHENKO responded: "up to 300k usd," and CC-2 responded, in part, that he was "going down the beaten path: old bank-small payments."  Based on my training, experience, and involvement in this investigation, I believe CC-2 was telling MARCHENKO that he (CC-2) would pay MARCHENKO for the Micro-Displays from his Russian bank accounts like he had previously. *See supra* ¶ 22(i), (j).  Indeed, two weeks later, CC-2 messaged MARCHENKO that he, in fact, had made a payment of "100k."

g.       Between in or about December 2022 and in or about February 2023, Alice Components made fourteen separate wire transfers from the Hong Kong-based accounts of several of MARCHENKO's front companies—Namfleg, SSP Limited, and RG Solutions—to the UC Company's bank account located in Manhattan, New York, as displayed below.  In total, Alice Components transferred approximately $1,333,294.85.

| Date | Entity Sending Wire | Amount |
|---|---|---|
| November 25, 2022 | Namfleg | $33,594.85 |
| December 13, 2022 | RG Solutions | $99,980.00 |
| December 15, 2022 | RG Solutions | $99,980.00 |
| December 19, 2022 | RG Solutions | $99,980.00 |
| December 19, 2022 | RG Solutions | $99,980.00 |
| December 21, 2022 | RG Solutions | $99,980.00 |
| December 21, 2022 | RG Solutions | $99,980.00 |
| December 22, 2022 | RG Solutions | $99,980.00 |
| December 28, 2022 | RG Solutions | $99,980.00 |
| January 27, 2023 | SSP Limited | $99,972.00 |
| January 31, 2023 | SSP Limited | $99,972.00 |
| February 2, 2023 | SSP Limited | $99,972.00 |
| February 3, 2023 | SSP Limited | $99,972.00 |
| February 8, 2023 | SSP Limited | $99,972.00 |
| | **Total:** | **$1,333,294.85** |

h.      In addition to attempting to conceal the true source of funds from the UC Company by using MARCHENKO's Hong Kong companies to send the payments, just as they had for the June Order and August Order from Company-1, members of the Procurement Network continued to make misrepresentations in support of their cover story that the Micro-Displays were not going to Russia. For example, on or about January 30, 2023, CC-1 (posing as "Amy") submitted a "Statement By Ultimate Consignee and Purchaser," also known as a Form BIS-711,[6] to the UC Company.  The Form contained an explicit warning that the "making of any false statements or concealment of any material fact in connection with [the Form BIS-711] may result in imprisonment or fine."  CC-1 stated that the Micro-Displays were to be used in ophthalmological microscopes and "glasses 3D visualization for the microscopes." The end-user countries were listed as "China, HK [Hong Kong], Malaysia, Europe"—*i.e.*, not Russia.

i.      On or about February 14, 2023, the UC informed CC-1 (posing as "Amy Chan") that a shipment containing 700 of the 2,450 remaining Micro-Displays ("Shipment-2") had been shipped and provided the shipment tracking information. Over the next approximately three days, IP addresses associated with NPC Granat (the Russian company) checked the tracking information for Shipment-2. Shortly thereafter, on or about March 2, 2023, CC-1 messaged MARCHENKO and asked him to send $294,000 to the UC Company.

***The Procurement Network Makes Overt Attempts to Evade U.S. Law Enforcement Scrutiny After Shipment-2 Is Detained***

j.      On or about March 4, 2023, the UC informed CC-1 (posing as "Amy Chan") that the Department of Commerce had detained Shipment-2 because of a concern that it would be diverted to prohibited end users in Russia. On or about March 6, 2023, CC-1 messaged MARCHENKO and provided MARCHENKO with the name and phone number for the UC.

k.      That day, MARCHENKO, using the 1175 Number, had a recorded phone conversation with the UC. During that phone call, in substance and in part, MARCHENKO identified himself as "Maxim" from "Alice Components" and stated that he worked with "Amy"— a reference to CC-1's fictitious persona. MARCHENKO then falsely explained that payment for the Alice Components' orders was coming from a third party because of a problem with the bank account and that a lot of accounts were closed. As described above, MARCHENKO knew that this representation was false:  he and other members of the Procurement Network discussed using his front companies in Hong Kong to obfuscate the fact that payment for the Micro-Displays came from Russia. *See supra* ¶¶ 20(c), (d); 22(i); 23(c).

l.      While Shipment-2 was detained, CC-1 (posing as "Amy Chan") initially asked the UC, on or about March 13, 2023, to ship the Micro-Displays to SSP LTD, which was located at the Castle Peak Address in Hong Kong. Later, CC-1, who expressed frustration to the

---

[6] Form BIS-711, also known as a Statement by Ultimate Consignee and Purchaser, provides information on the foreign importer receiving the U.S. technology and how the technology will be used. Federal regulations require the ultimate consignee or purchaser to provider either a statement on company letterhead with certain information or the Form BIS-711. *See* 15 C.F.R. § 748.11(c).

UC about Shipment-2 being detained, sent an email to the UC, asking the UC Company to issue a refund to Alice Components and provided the bank account information for SSP LTD.

        m.     While Shipment-2 was detained, CC-1, CC-2, and MARCHENKO remained in contact about Shipment-2.

        n.     In or about July 2023, the UC informed CC-1 (posing as "Amy Chan") that the Department of Commerce had released Shipment-2 and that the UC Company was in possession of it.

        o.     On or about August 14, 2023, the UC and MARCHENKO exchanged several messages about the Micro-Displays that Alice Components ordered from the UC Company:

| | |
|---|---|
| UC: | I still haven't heard from you. I'm not sure where you want to go from here . . . I'm going to move the items from my office to our warehouse for storage until I hear from you. |
| MARCHENKO: | hi, no one can come to US for pickup |
| MARCHENKO: | can you send low value parcel by USPS |
| MARCHENKO: | make value below 2500usd |
| UC: | This is over a million dollars worth of product. Are you sure that is a good idea? |
| MARCHENKO: | less risk |
| MARCHENKO: | do before |
| MARCHENKO: | split for few parcel |
| UC: | Where do you want me to ship them to? How many split parcels do you want? |
| MARCHENKO: | how its paked [sic] now? |
| MARCHENKO: | try 100pcs first |
| UC: | I think multiple shipment creates more risk. I can put a paid invoice in the box for a lower amount like you said. Who did you put on the end user form? |
| MARCHENKO: | below 2500usd no need |

MARCHENKO then provided the contact information for Namfleg. Based on my training, experience, I believe, in instructing the UC to package and send the Micro-Displays in this fashion, MARCHENKO was trying to circumvent the requirement to provide an EEI ("below 2500usd no need") and thus avoid reporting the true destination of these goods (Russia).

### Members of the Procurement Network Sought to Avoid U.S. Government Scrutiny and Maintain Their Cover Story

24.     Based on my training, experience, conversations with other law enforcement agents and individuals, review of records and email communications maintained by Company-1, review of open-source materials, bank records, and email communications and messages obtained pursuant to judicially authorized search warrants, and draft summaries and translations of such documents and communications, I have learned the following, in substance and in part:

a.     Members of the Procurement Network were wary of U.S. Government scrutiny of their illicit activities and openly discussed the need to maintain their cover story.

b.     For instance, on or about June 29, 2022, MARCHENKO and CC-2 exchanged the following messages about actions the United States had taken against Chinese companies that violated sanctions by supporting the Russian defense apparatus and the need for the Procurement Network to proceed with care:

MARCHENKO:     The White House blacklisted five Chinese companies for violating sanctions by supporting Russian military and defense companies.

This includes Connec Electronic, King Pai Technology, Sinno Electronics, Winninc Electronic, and World Jetta (HK) Logistics.

— Today's action sends a strong message to businesses and individuals around the world that if they seek to support Russia, the United States will take action, — said U.S. Deputy Secretary of Commerce Alan Esteves.

CC-2:     So we'll be even more careful

c.     Similarly, on or about March 14 and 15, 2023, MARCHENKO sent multiple messages to CC-1 about banks being sanctioned by OFAC. In particular, MARCHENKO sent a message about an NPC Topaz transaction being returned because it was sent by a sanctioned bank.

d.     Members of the Procurement Network also discussed inventing other fictitious covers to potentially obtain more goods from Company-1. For instance, on or about September 30, 2022, CC-1 emailed MARCHENKO and asked him to contact Company-1 about 170 pieces of Part Number-2 (i.e., a specific version of the Micro-Displays). CC-1 instructed

MARCHENKO to make the request from "a third party company that hasn't passed before (can't be Neway, RG Solution, IRZ)." CC-1 further told MARCHENKO that the application would be a viewfinder for an action camera and stated that the project would require 5,000 pieces in a year. Based on my training, experience, and participation in this investigation, I believe that CC-1 asked MARCHENKO to order more Micro-Displays from Company-1 using another one of MARCHENKO's front companies and creating another false cover story that Company-1 was not familiar with so as to avoid arousing scrutiny or suspicion for future orders.

     e.   Finally, on or about March 6, 2023—the day MARCHENKO reached out to the UC to discuss the Department of Commerce detaining Shipment-2—CC-1 bluntly told MARCHENKO that: "We support the legend that we are Alice Components and we know nothing about Russia." Based on my training, experience, and involvement in this investigation, I believe CC-1 was reassuring MARCHENKO that CC-1 was committed to the cover story created by the Procurement Network in light of U.S. Government scrutiny of the Procurement Network's efforts to smuggle sensitive technologies to Russia.

     25.   In summary, based on my training, experience, and participation in this investigation, including, among other things, the fact that (1) prior to in or about February 2022, MARCHENKO paid for and received at least some orders from Company-1 on behalf of Radiofid, whose end user was listed as an entity in Russia; (2) Alice Components became a customer of Company-1 shortly after Russia invaded Ukraine in or about February 2022 and Company-1 decided it would not sell to Russian customers or customers who shipped their goods to Russia; (3) Alice Components used third party companies associated with MARCHENKO to pay Company-1 and the UC Company, and these third party companies often received payment from Russian companies prior to paying Company-1 or the UC Company; (4) MARCHENKO sent or received messages about evading sanctions and banks returning certain transactions due to sanctions; (5) CC-2, who is connected to Russian companies OOO NPTC Topaz and NPC Granat, which is on the Department of Commerce's Entity List, messaged MARCHENKO that payment (equal to outstanding balances Alice Components owed to Company-1 and the UC Company) would be sent to MARCHENKO's front company, RG Solutions; (6) CC-1 often instructed MARCHENKO to pay Company-1 or the UC Company; (7) CC-1, in a conversation with MARCHENKO, referred to Alice Components as a "legend"; (8) IP addresses associated with Russian company NPC Granat checked on the status of Shipment-1 and Shipment-2 shortly after the tracking information was provided to CC-1; (9) MARCHENKO told the UC to split the Micro-Displays into multiple parcels and declare that the value of the package was under $2,500, likely to avoid filing an EEI; and (10) MARCHENKO's companies sent or received invoices, or had contracts with, Russia-based companies for Micro-Displays, I believe members of the Procurement Network, including MARCHENKO, falsely represented to Company-1 and the UC Company that the Micro-Displays were destined for countries other than Russia with the belief that these false representations would be passed along to U.S. government agencies.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of MAXIM MARCHENKO, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

JASON WAKE
Special Agent
Federal Bureau of Investigation

Sworn to me this 25th day of August, 2023.

THE HONORABLE JUDITH C. McCARTHY
United States Magistrate Judge
Southern District of New York

21